UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LOREN D. GARY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00009-DML-TWP |
| | ) | |
| DENNIS REAGLE, *Warden*, EMILY KNOTTS, | ) | |
| THOMAS SOLOMAN, LISA HAMBLEN, LINDSEY | ) | |
| COTTRELL, *R.N.*, OLUWAFEMI DASO, *R.N.*, | ) | |
| JOHNNA FRITCH, *D.O.N.*, and CENTURION | ) | |
| HEALTH OF INDIANA, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

## Order Granting Defendants' Motions To Strike and Motions for Summary Judgment

Plaintiff Loren Gary is incarcerated at Pendleton Correctional Facility

("PCF") and alleges that Defendants Warden Dennis Reagle, Emily Knotts, and

Thomas Solomon[1] (collectively, "the State Defendants"), Nurse Lindsey Cottrell and

Centurion Health of Indiana, LLC ("Centurion") (collectively, "the Centurion

Defendants"), and Nurse Oluwafemi Daso violated his constitutional rights and/or

were negligent when they denied his requests to move cells and for medical

treatment after he had trouble breathing because of construction work at PCF.

[Filing No. 9; Filing No. 11.]  Specifically, Mr. Gary asserts Eighth Amendment

deliberate indifference claims against the State Defendants, Nurse Cottrell, and

---

[1] The Clerk is **DIRECTED** to **CORRECT** Defendant "Thomas Soloman" to
"Thomas Solomon" on the docket, as that is the spelling Mr. Gary uses in his
Amended Complaint and the State Defendants use in their various filings.

Nurse Daso and state law negligence claims against all the Defendants.[2]  [*See* Filing No. 11.]  The State Defendants have filed a Motion for Summary Judgment, [Filing No. 114], and a Motion to Strike Summary Judgment Response and Designation, [Filing No. 184]; the Centurion Defendants have filed a Motion for Summary Judgment, [Filing No. 150], and a Motion to Strike Plaintiff's Improper Surreply, [Filing No. 183]; and Nurse Daso has filed a Motion for Summary Judgment, [Filing No. 154].  All of these motions are ripe for the court's consideration.

## I.
## Motions to Strike

Because the adjudication of the Centurion Defendants' Motion to Strike Plaintiff's Improper Surreply, [Filing No. 183], and the State Defendants' Motion to Strike Summary Judgment Response and Designation, [Filing No. 184], affects the evidence and arguments that the court will consider in connection with the motions for summary judgment, the court addresses those motions first.

### A.    The Centurion Defendants' Motion to Strike Plaintiff's Improper Surreply [Filing No. 183]

After the Centurion Defendants filed their reply in support of their motion for summary judgment, Mr. Gary filed a surreply with an Affidavit from Curtis Woodard, Mr. Gary's fellow inmate.  [Filing No. 182; Filing No. 182-1.]  The Centurion Defendants have filed a Motion to Strike Plaintiff's Improper Surreply in which they argue that Mr. Gary's surreply violates Local Rule 56-1(d) because in

---

[2] The court screened Mr. Gary's Amended Complaint as directed by 28 U.S.C. § 1915A and dismissed additional claims Mr. Gary had asserted against other individuals.  [Filing No. 11.]

2

their reply, the Centurion Defendants did not cite new evidence or object to the admissibility of evidence cited in Mr. Gary's response.  [Filing No. 183 at 2.]  They assert that "[i]nstead, [Mr. Gary's] Surreply is [his] reiteration of arguments he has already made and new arguments he should have made but did not make in his Response."  [Filing No. 183 at 2.]  Mr. Gary did not file a response to the motion to strike.

"The purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 WL 1258052, at *2 (S.D. Ind. Mar. 25, 2010) (internal quotation and citation omitted).  Local Rule 56-1(d) allows a summary judgment surreply "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response."  S.D. Ind. L.R. 56-1(d).  Where a surreply is permitted, it may address only the new evidence or objections, and the non-movant may not introduce entirely new evidence. *Best v. Safford*, 2018 WL 1794911, at *2 (S.D. Ind. Apr. 16, 2018).

The Centurion Defendants did not present new evidence in connection with their reply brief or object to the admissibility of evidence that Mr. Gary submitted with his response.  Mr. Gary uses his surreply to rehash the arguments he made in his response and to raise new arguments and present new evidence that he could have raised and presented in his response.  Neither is permitted.  Additionally, Mr.

Gary did not respond to the motion to strike and so has not even attempted to justify the filing of his surreply.

The court **GRANTS** the Centurion Defendants' Motion to Strike Plaintiff's Improper Surreply, [Filing No. 183], and **STRIKES** Mr. Gary's surreply, [Filing No. 182]. The court will not consider Mr. Gary's surreply in connection with the Centurion Defendants' Motion for Summary Judgment.

### B. The State Defendants' Motion to Strike Summary Judgment Response and Designation [Filing No. 184]

The State Defendants filed their Motion for Summary Judgment on April 22, 2025, [Filing No. 114], along with a Notice Regarding Right to Respond to and Submit Evidence in Opposition to Motion for Summary Judgment in which they advised Mr. Gary that he could file a response to the motion for summary judgment by May 21, 2025, [Filing No. 117]. On April 30, 2025, Mr. Gary moved for an extension of time to file his response to the State Defendants' Motion for Summary Judgment, [Filing No. 127], and the court granted his motion and extended the deadline for his response to June 20, 2025, [Filing No. 129]. On June 11, 2025, Mr. Gary filed another motion for extension of time, requesting a 30-day extension to file his response to the State Defendants' motion for summary judgment. [Filing No. 144.] On June 18, 2025, before his motion for extension of time was ruled on, Mr. Gary filed a response to the State Defendants' motion for summary judgment, [Filing No. 149], and the court subsequently granted the motion for extension of time, making Mr. Gary's response due July 11, 2025, and noted that Mr. Gary had already filed his response, [Filing No. 169]. On August 25, 2025, more than six

4

weeks after the extended July 11 deadline had expired, Mr. Gary filed a Motion of

Opposition to State Defendant(s) Motion for Summary Judgment, [Filing No. 179], a

Brief in Support of Precluding Summary Judgment for State Defendant(s), [Filing

No. 180], and a Designation of Evidence and Proposed Witness List that attached

nearly twenty pages of exhibits, including the same Affidavit from Mr. Woodard

that Mr. Gary filed in connection with his surreply to the Centurion Defendants'

Motion for Summary Judgment, a Statement from fellow inmate Jason Schwartz,

and a handwritten statement from "Ofc J. Jessie," among other documents, [Filing

No. 181].

The State Defendants move to strike Mr. Gary's Motion of Opposition to

State Defendant(s) Motion for Summary Judgment, [Filing No. 179], and his

Designation of Evidence and Proposed Witness List, [Filing No. 181], arguing that

even *pro se* litigants like Mr. Gary must comply with the Federal Rules of Civil

Procedure and that he has not "explained his failure to designate evidence within

the filing deadline." [Filing No. 184 at 2.]

Mr. Gary argues in response to the motion to strike that extraordinary

circumstances caused him to file his response late, including that he has been

suffering from mental health issues and that "[i]n June of 2025 [he] suffered a

mental health crisis that triggered a P.T.S.D., nervous [breakdown] exacerbated by

mental health drugs that were errantly pr[e]scribed and un-monitored." [Filing No.

186 at 1.] He states that he attempted suicide by overdose on August 27, 2025.

[Filing No. 186 at 1-2.] Further, Mr. Gary contends that his "supporting materials

and opposing motion" were due on July 16, 2025, and that the State Defendants could have filed a motion for default judgment on August 20, 2025, but "only after reviewing the evidence, arguments and citations of law [and determining that they were] detrimental to their position" did they file their motion to strike.  [Filing No. 186 at 2.]

The court has discretion to enforce compliance with its discovery and briefing rules and deadlines, which may include striking belated briefs and designations of evidence.  *See Best*, 2018 WL 1794911, at *2; *see also McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019) ("[D]istrict judges may strictly enforce local summary-judgment rules").  "Strict enforcement" may also apply to *pro se* litigants.  *See McCurry*, 942 F.3d at 787 n.2.

While the court is sympathetic to any mental health issues that Mr. Gary may have been dealing with, his timeline of events does not excuse his non-compliance with the July 11, 2025 deadline for filing his response – a deadline with which Mr. Gary ultimately complied when he filed his first response on June 18, 2025, [Filing No. 149].  To the extent that he suffered from mental health issues in June 2025, they did not interfere with his understanding that his response was due. Additionally, his claimed suicide attempt on August 27, 2025, came well after the July 11, 2025 deadline had passed and after he had filed his belated response and evidence.  [Filing No. 179; Filing No. 180; Filing No. 181.]  Finally, Mr. Gary demonstrated during this period that he not only understood the requirement to file

a timely response but also that he had the capacity to seek extensions of time for his response.

In short, Mr. Gary has not provided any justification for why he filed a response with new evidence six weeks after the deadline for doing so and after he had already filed a response within the deadline. "The Court has the discretion to deny a request for leave to file a supplementary response to a motion for summary judgment where the party does not explain why the materials in the supplementary response could not have been discovered earlier, or why he had not immediately sought to amend or extend the filing deadline." *Spierer v. Rossman*, 2014 WL 4908023, at *3 (S.D. Ind. Sept. 30, 2014), *aff'd*, 798 F.3d 502 (7th Cir. 2015) (citing *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1257 (7th Cir. 1993)).  Accordingly, the court exercises its discretion to enforce court deadlines, **GRANTS** the State Defendants' Motion to Strike Summary Judgment Response and Designation, [Filing No. 184], and **STRIKES** Mr. Gary's Motion of Opposition to State Defendant(s) Motion for Summary Judgment, [Filing No. 179], his Brief in Support of Precluding Summary Judgment for State Defendant(s), [Filing No. 180],[3] and his Designation of Evidence and Proposed Witness List, [Filing No. 181].

---

[3] The State Defendants request only that the court strike Mr. Gary's Motion of Opposition to State Defendant(s) Motion for Summary Judgment, [Filing No. 179], and his Designation of Evidence and Proposed Witness List, [Filing No. 181], but do not specifically request that it strike his Brief in Support of Precluding Summary Judgment for State Defendant(s), [Filing No. 180].  The court surmises that this was an oversight, as all three filings belatedly respond to the State Defendants' Motion for Summary Judgment and were filed on the same day.  The court strikes

In any event and as addressed *infra* pp. 33 and 43, the evidence that Mr. Gary submitted with his improper surreply and his belated response would not change the court's ruling on the Centurion Defendants' Motion for Summary Judgment

## II.
## Motions for Summary Judgment

### A.    Standard of Review

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  A court has to consider only the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (cleaned up).  Moreover, "where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no

---

Mr. Gary's Brief in Support of Precluding Summary Judgment for State Defendant(s), [Filing No. 180], in its discretion but, as discussed below, consideration of that filing does not change the court's ruling on the State Defendants' Motion for Summary Judgment.

reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## B.    Factual Background

The facts stated below are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005). In other words, because the Defendants have moved for summary judgment under Rule 56(a), the court views and recites the evidence in the light most favorable to Mr. Gary, including giving him the benefit of conflicting evidence, and draws all reasonable inferences in his favor.

*Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022); *Khungar*, 985 F.3d at 572-73. This means that where Mr. Gary has submitted admissible evidence regarding his version of events, the court accepts his version as true for the purposes of summary judgment, ignoring the Defendants' conflicting evidence.

       1.     *Defendants' Positions at PCF*

Warden Reagle was PCF's Warden during the events underlying this litigation. [Filing No. 9 at 3.] Ms. Knotts[4] was a casework manager in G-Cellhouse at PCF and Mr. Solomon was a counselor in G-Cellhouse. [*See* Filing No. 9 at 3.]

Centurion is a "qualified health care provider" within the meaning of the Indiana Medical Malpractice Act. [Filing No. 150-3 at 2.] Nurse Cottrell is a Registered Nurse who previously worked at PCF. [Filing No. 150-1 at 1.] Her job responsibilities at PCF were to provide appropriate nursing care to patients based on their specific medical needs, which could include assessing/triaging patients, dispensing medication according to a provider's order, or making appropriate referrals. [Filing No. 150-1 at 1.]

Oluwafemi Daso is a male[5] Registered Nurse who began working at PCF in November 2020. [Filing No. 154-2 at 1.] Nurse Daso's last day of employment at PCF was April 26, 2023. [Filing No. 154-2 at 1.] He was not employed at PCF during June or July 2023. [Filing No. 154-2 at 2.]

---

[4] The State Defendants refer to Ms. Knotts as "Emily Sarten f.k.a. Emily Knotts," [*see, e.g.*, Filing No. 116 at 2], but the court refers to her as Ms. Knotts since the State Defendants have not formally asked the court to correct the docket.

[5] The relevance of Nurse Daso's gender is explained *infra*.

### 2.     Mr. Gary's Prior Employment

Before his incarceration at PCF, Mr. Gary worked in the heavy industrial webbing and fabrication industry in various settings, including factories, machine shops, fabrication shops, and assemblies.  [Filing No. 115-1 at 10-11.]  Mr. Gary also has experience working in construction, home repair and improvement, and appliance repair.  [Filing No. 115-1 at 11.]  He has held welding and hazmat-related certifications.  [Filing No. 115-1 at 11.]

### 3.     Mr. Gary's Health

Mr. Gary testified that he was diagnosed with asthma and COPD around 2018 and he is routinely prescribed an inhaler for those conditions.  [Filing No. 115-1 at 23; Filing No. 115-3 at 1-8.]

### 4.     G-Cellhouse

Mr. Gary was housed in G-Cellhouse from around January 2023 to early February 2024.  [Filing No. 115-1 at 12-13.]  G-Cellhouse has three levels for housing inmates that are in either administrative or disciplinary segregation. [Filing No. 115-1 at 13.]  In June and July 2023, Mr. Gary was in disciplinary segregation in G-Cellhouse.  [Filing No. 115-1 at 13-14.]

While Mr. Gary was housed in G-Cellhouse, there was ongoing construction work that consisted of ripping up flooring and moving electrical systems around so that inmates would no longer have access to these systems from inside their cells. [Filing No. 115-1 at 14-17.]  The renovations generated dust, welding sparks, and welding smoke.  [Filing No. 115-1 at 17-18; Filing No. 115-1 at 31.]  When

construction was occurring on a particular range, inmates housed there would be moved to another range. [Filing No. 115-1 at 15.] There was a focus on regularly cleaning up during construction and inspections from prison officials determined that G-Cellhouse was well maintained during the construction process. [Filing No. 115-7 at 2.] Additionally, inmates and staff were offered and could request the same personal protective equipment, including goggles and dust masks, if they were close to construction. [Filing No. 115-7 at 2.][6]

### 5. *Nurse Cottrell's Duties at PCF and Encounters With Mr. Gary in June 2023*

Nurse Cottrell does not recall what area of PCF she was assigned to in June 2023 or what duties she was performing on any given day. [Filing No. 150-1 at 2.] She does recall that Mr. Gary was housed in G-Cellhouse during that time. [Filing No. 150-1 at 2.] Nurse Cottrell could have encountered Mr. Gary in G-Cellhouse in several ways. [Filing No. 150-1 at 2.] First, if she was assigned as the medication nurse, she could have passed out medications to patients, which typically would take up her entire shift. [Filing No. 150-1 at 2.] During medication pass, Nurse Cottrell had to prioritize distributing medication to numerous inmate patients that relied on their daily and timely medications. [Filing No. 150-1 at 2.] She would not stop and speak with inmate patients while passing out medications and, instead, she had to provide medications in a timely and orderly fashion. [Filing No. 150-1 at

---

[6] Mr. Woodard states in his Affidavit, which the court has stricken, that during construction in June and July 2023, "no masks [were] passed out." [Filing No. 182-1 at 1.]

2.]  While passing medication, Nurse Cottrell would not immediately stop dispensing medication to inmates in order to escalate a medical request or complaint from another inmate, unless it was an emergency situation where an inmate required immediate or emergency medical treatment.  [Filing No. 150-1 at 2.]  If Mr. Gary had handed Nurse Cottrell a Request for Health Care form during medication pass, she would not have stopped what she was doing to talk to him but would have just accepted the form and turned it in to the nurses' station for another nurse to triage the request.  [Filing No. 150-1 at 2.]

Second, Nurse Cottrell could have encountered Mr. Gary in G-Cellhouse if she was conducting Nursing Sick Call and was in the segregation unit to see patients who were on the list for Nursing Sick Call.  [Filing No. 150-1 at 3.]  If she was on the unit seeing other patients and Mr. Gary had handed her a Request for Health Care form, she would not have stopped what she was doing related to other patients to talk to Mr. Gary but would have accepted the form and turned it in to the nurses' station for another nurse to triage the request.  [Filing No. 150-1 at 3.]

Nurse Cottrell does not recall receiving any Request for Health Care forms that Mr. Gary personally handed to her, but if he had handed her a form during her medication pass or Nursing Sick Call, she would have taken the form and turned it into the nurses' station in the medical unit once she had completed her medication pass or Nursing Sick Call.  [Filing No. 150-1 at 3.]  Once Request for Health Care forms were turned in to the nurses' station, nursing staff triaged the requests to determine which ones took priority because they involved serious or urgent medical

13

needs. [Filing No. 150-1 at 3.] Most of the Requests for Health Care forms were reviewed and triaged by the Director of Nursing. [Filing No. 150-1 at 3.] If the request was something that could not be handled without seeing the patient, then the inmate patient would be scheduled to be seen in Nursing Sick Call. [Filing No. 150-1 at 3.]

Nurse Cottrell did not determine whether inmates should be moved to different areas of the prison for medical reasons. [Filing No. 150-1 at 4.] That was determined by the medical provider and, ultimately, the prison administration. [Filing No. 150-1 at 4.]

### 6.    *Mr. Gary's June 5, 2023 Request for Health Care*

On June 5, 2023, Mr. Gary submitted a Request for Health Care form in which he stated:

> I have chronic pain in my neck, shoulders, back and hands. In April I was told I would be treated with Tylenol and Mobic. As of 6/5 the Tylenol has stopped coming, why?

[Filing No. 150-2 at 1.] Medical staff responded two days later, stating "Tylenol is available to you in commissary." [Filing No. 150-2 at 1.]

### 7.    *Mr. Gary's June 10, 2023 Request for Health Care*

On June 10, 2023, Mr. Gary submitted a Request for Health Care form in which he stated:

> I was told after getting medication from medical for 3 months I have to buy it off commissary. I don't have money to buy medicine with.

[Filing No. 150-2 at 2.] Medical staff responded, stating "[w]hat medication are you referring to?" [Filing No. 150-2 at 2.]

8.    *Mr. Gary's June 16, 2023 Request for Health Care*

On June 16, 2023, Mr. Gary submitted a Request for Health Care form in which he stated:

> In March of this year I was prescribed Tylenol by medical staff. On June 5th I stopped [receiving] Tylenol from medical. On June 7th I was told I had to purchase Tylenol on commissary. I do not have money to buy Tylenol with.

[Filing No. 150-2 at 3.] Medical staff responded, stating "[o]rder for tylenol expired 6/4/23." [Filing No. 150-2 at 3.]

9.    *Construction on June 26, 2023*

On June 25, 2023, Mr. Gary was moved from a third floor unit in 6-D down a floor to a newly renovated unit in 4-D where construction had just been completed. [Filing No. 115-1 at 15; Filing No. 115-2 at 2.] On June 26, 2023, renovations began on the range below Mr. Gary's, including ripping up flooring and shelving and moving electrical systems. [Filing No. 115-1 at 14-16.] Nurse Cottrell has no recollection of Mr. Gary complaining to her on June 26, 2023 that he could not breathe. [Filing No. 150-1 at 5.][7] Ms. Cottrell stated in her Affidavit that if Mr. Gary had presented to her with a medical emergency or any medical issue that required immediate medical treatment on June 26, 2023, she would have made sure that he was seen by medical staff immediately. [Filing No. 150-1 at 5.]

---

[7] Mr. Schwartz states in his Affidavit, which the court has stricken, that in June and July 2023, he saw Mr. Gary "talk to the nurses about how he can't breathe cause of all the dust and smoke," that he saw the nurses "get the health care forms," and that Mr. Gary was "waving a napkin out his bars." [Filing No. 181 at 8.] He does not identify which nurses Mr. Gary interacted with.

### 10.    Mr. Gary's June 27, 2023 Request for Health Care

On June 27, 2023, Mr. Gary completed a Request for Health Care form in which he stated:

> Help! There is construction going on on this side of the cell house. I can't breathe with all of the grinding dust and such with my COPD. Can you recom[m]end a medical move for me please.

[Filing No. 150-2 at 8.] In response to a question on the form stating "I request Health Care Services as follows," Mr. Gary checked a box marked "Other (specify)" and wrote "Help" in the blank. [Filing No. 150-2 at 8.] He did not check a provided box to request a "Sick Call."[8] [Filing No. 150-2 at 8.]

### 11.    Mr. Gary's July 3, 2023 X-Ray and Request for Health Care

On July 3, 2023, Mr. Gary had physical therapy and received an x-ray of his lumbar spine. [Filing No. 150-2 at 9-18.] The same day, he submitted a Request for Health Care form to mental health staff stating that he was "terrified of population and [felt] like something very bad [was] going to happen." [Filing No. 150-2 at 19.] He was scheduled to see a mental health provider in response to his Request for Health Care. [Filing No. 150-2 at 19.]

### 12.    Mr. Gary's July 5, 2023 Move Request

The Indiana Department of Correction ("IDOC") contracts with Centurion for all offender health care services. [Filing No. 115-7 at 2.] If medical staff ordered a medical move for an inmate, the medical order and housing transfer documentation

---

[8] As discussed *infra*, Mr. Gary was not ultimately seen in response to this Request for Health Care and others until August 10, 2023, nearly six weeks later. [Filing No. 150-1 at 5.]

would be sent to appropriate prison staff to facilitate the move. [Filing No. 115-6 at 2.]

Mr. Gary understood the process for requesting a medical move and that it required a medical professional to order a move as medically necessary for an incarcerated individual. [Filing no. 115-1 at 28-29.] On July 5, 2023, Mr. Gary saw Mr. Solomon, a G-House counselor, in his office on his way to the showers and asked about being moved away from the construction to another range. [Filing No. 115-1 at 22.] Mr. Solomon acknowledged Mr. Gary's request and advised him that he did not have a vacant cell to move him to. [Filing No. 115-1 at 22-23.]

Mr. Gary also saw Ms. Knotts, a casework manager, on July 5, 2023, while he was being escorted by a non-party correctional officer from shower time. [Filing No. 115-1 at 26.] He asked Ms. Knotts about a medical move, but he did not tell her about the medical reasons for his request at that time.[9] [Filing No. 115-1 at 26-28.] Ms. Knotts acknowledged Mr. Gary's pending move request during their brief passing encounter, but did not have access to Mr. Gary's medical records and any medical move request by Mr. Gary would have been initially submitted to and handled by medical staff. [Filing No. 115-6 at 2-3.]

### 13.    Construction on July 6, 2023

On July 6, 2023, construction workers were welding a large metal barrier that extended from the lower level 2 range all the way up to the third level 6 range,

---

[9] Ofc. J. Jessie wrote in his statement, which the court has stricken, that he recalled Mr. Gary asking Ms. Knotts about a "medical move" on July 5, 2023. [Filing No. 181 at 21.] This does not conflict with the Defendants' evidence on this point.

so that inmates could not jump or fall over the railings while on the walkways outside the ranges.  [Filing No. 115-1 at 18-19.]  Construction that date, which occurred below Mr. Gary's range, consisted of stacking large metal barriers and welding them into place.  [Filing No. 115-1 at 17.]

Mr. Gary claims that around 10:00 a.m. on July 6, 2023, he was hit by a piece of welding debris on his right forearm just above his wrist, resulting in a fourth degree burn.  [Filing No. 115-1 at 19.]  Mr. Gary was not diagnosed by any medical staff as having a fourth degree burn, but he believes he had a fourth degree burn based on both his previous experience working in refineries and his hazmat-related training.[10]  [Filing No. 115-1 at 20.]  Mr. Gary showed the burn to a nurse, who gave him some salve for his arm.  [Filing No. 115-1 at 49-50.]  The construction work ended in Mr. Gary's area of G-Cellhouse shortly after July 6, 2023.  [Filing No. 115-1 at 30-31.]

### 14.    *Mr. Gary's July 6, 2023 Health Care Request*

On July 6, 2023, Mr. Gary completed a Health Care Request form in which he stated:

> There's construction just outside my cell, burning welding, grinding.  I can not breathe.  I feel like I'm suffocating.  I have COPD the air is too thick!  Feeling light headed!

[Filing No. 115-3 at 3.]  Mr. Gary requested a "sick call."[11]  [Filing No. 115-3 at 3.]

---

[10] Mr. Schwartz states in his Affidavit, which the court has stricken, that "[a] guy was welding and the sparks were going in his cell," and that Mr. Gary told him "some come in his cell and burned him."  [Filing No. 181 at 8.]

[11] Ofc. J. Jessie wrote in his statement, which the court has stricken, that on July 6, 2023, Mr. Gary "told [a] nurse that he was having trouble breathing from the smoke

15.    *Mr. Gary's July 7, 2023 Move Request*

On July 7, 2023, Mr. Gary sent a Request for Interview form to Warden Reagle stating that he needed to be moved due to the construction dust and debris because he has COPD.  [Filing No. 115-4.]  He stated:

> Help!  [They're] trying to kill me!  I have been complaining since June 26th 2023.  I have COPD and cannot breathe with the smoke and dust from the construction on this side of the cell house.  I am [suffocating]! Medical won't respond.  Capt'n Ernest won't respond.  The counselors won't respond.  I need to be moved, please.

[Filing No. 115-4.]

Warden Reagle's secretary would receive any requests sent to him and then forward them to the appropriate personnel to respond.  [Filing No. 115-5 at 2.]  The response to Mr. Gary's request for interview stated that the individual who handled it contacted Centurion's Director of Nurses, who was Johnna Fritch at that time, and verified that Mr. Gary has asthma, but not COPD.  [Filing No. 115-1 at 29; Filing No. 115-4.]  The response also instructed Mr. Gary to use his inhaler.  [Filing No. 115-4.]  Warden Reagle did not personally respond to Mr. Gary's request for interview and does not recognize the signature of the individual who did respond. [Filing No. 115-5 at 2.]  Warden Reagle did not know of Mr. Gary's request for interview until after Mr. Gary filed this lawsuit.  [Filing No. 115-7 at 2.]  Warden

---

and dust caused by the construction going just below his cell location," that Mr. Gary "[s]aid he had chest pain and dizziness," that the nurse "said she would make a note of it," and that Mr. Gary told her "he had been trying to get moved because he had COPD."  [Filing No. 181 at 21.]  Mr. Schwartz also states in his stricken Affidavit that he observed Mr. Gary "talk[ing] to the nurses about how he can't breathe cause of all the dust and smoke," and saw "the nurses get the health care forms."  [Filing No. 181 at 8.]

Reagle did not have any conversations with Ms. Fritch related to Mr. Gary's request because he never personally received it. [Filing No. 115-5 at 2; Filing No. 115-7 at 2.]

### 16. *Mr. Gary's July 10, 2023 Request for Health Care*

On July 10, 2023, Mr. Gary submitted a Request for Health Care form stating:

> Dr. Lamar I need to talk to you. Something bad is going to happen. I am terrified of population. Come see me soon!

[Filing No. 150-2 at 21.] In response, Mr. Gary was scheduled to be seen for follow up. [Filing No. 150-2 at 21.]

### 17. *Mr. Gary's July 12, 2023 Request for Health Care*

On July 12, 2023, Mr. Gary submitted a Request for Health Care form in which he stated that his "inhalers are running low." [Filing No. 150-2 at 22.] Medical staff responded on July 14, 2023, stating "will be delivered 7/14/23." [Filing No. 150-2 at 22.]

### 18. *Mr. Gary Is Seen By a Nurse During Routine Rounds on July 14, 2023*

On July 14, 2023, Mr. Gary was seen by a nurse performing routine isolation rounds in G-Cellhouse and she noted that Mr. Gary was awake and verbal, with no complaints. [Filing No. 115-3 at 10.] Mr. Gary routinely saw nurses twice daily to take his medication, and every nurse who saw him would tell him to use his inhaler. [Filing No. 115-1 at 32; Filing No. 115-1 at 39.]

19.    *Mr. Gary's July 16, 2023 Request for Health Care*

On July 16, 2023, Mr. Gary submitted a Request for Health Care form in which he stated:

> Attn:  Ms. Danielle.  I've been doing my physical therapy exercises regularly.  Back pain is worse, legs feel weak, and my feet feel numb afterwards.  Please advise.

[Filing No. 150-2 at 23.]  Medical staff wrote in response: "You began PT on 7/3. This will be an on-going process and can take time."  [Filing No. 150-2 at 23.]

20.    *Mr. Gary's July 31, 2023 Health Care Request*

On July 31, 2023, Mr. Gary submitted a Health Care Request form in which he stated that his best friend had committed suicide the day before and that he needed grief counseling.  [Filing No. 150-2 at 24.]  In response, medical staff scheduled him for follow up.  [Filing No. 150-2 at 24.]

21.    *Mr. Gary's August 7, 2023 Health Care Requests*

On August 7, 2023, Mr. Gary submitted two Health Care Request forms in which he stated that he had "[c]onstant nagging pain in neck and shoulders" and that his "hands burn, ache, and throb constantly."  [Filing No. 150-2 at 29-30.]

22.    *Mr. Gary is Seen by Nurse Cottrell*

On August 10, 2023, Mr. Gary was seen by Nurse Cottrell in response to his June 27, 2023, July 6, 2023, and August 7, 2023 Requests for Health Care and also a March 23, 2023 Request for Health Care in which he had asked for medical staff to obtain some of his prior medical records.  [Filing No. 115-3 at 1; Filing No. 150-1 at 5; Filing No. 150-2 at 8; Filing No. 150-2 at 20; Filing No. 150-2 at 29-33.]  Nurse Cottrell noted that Mr. Gary "smokes 30.00 packs a year," had been prescribed an

albuterol sulfate inhaler and fluticasone breath activated powder, and his requests

had been "[r]esolved" and "[n]o further action [was] necessary." [Filing No. 115-3 at

1.] She took his vital signs and offered him Tylenol. [Filing No. 150-1 at 5.] Mr.

Gary stated that all of his issues had been resolved or addressed. [Filing No. 150-1

at 5.] He stated in his deposition that his breathing issues had resolved "because the

construction had ended." [Filing No. 115-1 at 43-44.]

23.    *Mr. Gary's August 10, 2023 Request for Health Care*

On August 10, 2023, the same day that Mr. Gary was seen by Nurse Cottrell,

Mr. Gary submitted a Request for Health Care form in which he stated:

> For some time now I have been feeling dizzy quite a bit. I have
> discoloration around my ankles. Can I get checked 4 diabetes.

[Filing No. 150-2 at 31.] He saw a nurse on August 19, 2023, in response, and was

then referred to a provider. [Filing No. 150-2 at 31.]

24.    *Mr. Gary's August 12, 2023 Requests for Health Care*

On August 12, 2023, Mr. Gary submitted a Request for Health Care form,

stating:

> Tonight another man almost died. A guy cut himself yesterday. Scrapy
> is still walking 6 range he wants his phone call. I told you something
> bad was going to happen!

[Filing No. 150-2 at 34.] Medical staff responded that Mr. Gary was scheduled for a

follow up. [Filing No. 150-2 at 34.] Mr. Gary submitted another Request for Health

Care form the same day, stating that his inhalers were running low. [Filing No.

150-2 at 35.] Medical staff responded that inhalers had been ordered for him.

[Filing No. 150-2 at 35.]

25.    *Mr. Gary Is Seen by Nursing Staff and Mental Health Staff*

Mr. Gary saw nursing staff on August 19, 2023, and mental health staff during segregation rounds on August 22, 2023. [Filing No. 150-2 at 25-28; Filing No. 150-2 at 36-40.]

26.    *Mr. Gary's August 23, 2023 Request for Health Care*

On August 23, 2023, Mr. Gary submitted a Request for Health Care form in which he stated that he had "[p]ain and weakness in legs calves knot[t]ed up and cramping." [Filing No. 150-2 at 41.] He saw nursing staff in response and was referred to a provider. [Filing No. 150-2 at 41.]

27.    *Mr. Gary Is Seen by a Mental Health Provider*

On August 24, 2023, Mr. Gary was seen by Dr. Kelly McCafferty, a psychologist, regarding his Requests for Health Care related to his mental health status. [Filing No. 150-2 at 42-43.] Dr. McCafferty noted: "Client's report of MH symptoms does not appear accurate and he may be faking symptoms in an attempt to be transferred. Client does not present in a way that he is depressed or having any psychotic symptoms. Client also gave this therapist a past psych testing report that did not diagnos[e] him with any psychosis." [Filing No. 150-2 at 42.]

28.    *Mr. Gary's Failure to File a Complaint With the Indiana Department of Insurance*

Mr. Gary did not file a Proposed Complaint or Amended Complaint with the Indiana Department of Insurance against Centurion before naming it as a Defendant in this litigation and, consequently, his claim has not been presented to a medical review panel. [Filing No. 150-3 at 1-2.] He has, however, filed a Proposed Complaint

with the Indiana Department of Insurance against a different medical provider for different dates of alleged malpractice that are not related to this matter. [Filing No. 150-3 at 2.]

29.   *This Lawsuit*

Mr. Gary initiated this litigation in January 2024, [Filing No. 1], and filed the operative Amended Complaint in March 2024, [Filing No. 9]. The court screened his Amended Complaint as directed by 28 U.S.C. § 1915A and allowed certain claims to proceed, [Filing No. 11]; directed the Clerk to correct "Nurse Cemi" – whom Mr. Gary had named in his Amended Complaint – to "Oluwafemi Daso, R.N.,"[12] [Filing No. 45]; and granted a Motion for Partial Judgment on the Pleadings filed by Centurion and two other original Defendants, [Filing No. 134].[13] These rulings left the following claims to proceed:

- Eighth Amendment deliberate indifference claims against the State Defendants, Nurse Cottrell, and Nurse Daso; and

- State law negligence claims against the State Defendants, the Centurion Defendants, and Nurse Daso.

---

[12] This correction was based on a Notice filed by Centurion, in which it advised the court that it had searched its employee database and that no employee named "Cemi" had worked for Centurion. [Filing No. 26 at 1.] Centurion advised further that after reviewing Mr. Gary's medical records, it believed that Nurse Daso was actually the individual who had treated Mr. Gary during the relevant time period. [Filing No. 26 at 1-2.] Subsequently, Mr. Gary filed a Notice acknowledging Nurse Daso's substitution for Nurse Cemi as a defendant. [Filing No. 35.]

[13] Specifically, the Screening Order allowed Eighth Amendment deliberate indifference and state law negligence claims to proceed against original Defendants Lisa Hamblen and Johnna Fritch and a *Monell* claim to proceed against Centurion, but the court granted a Motion for Partial Judgment on the Pleadings as to all of those claims. [Filing No. 11; Filing No. 134.] To that end, the court **DIRECTS** the **CLERK** to **TERMINATE** Lisa Hamblen and Johnna Fritch, *D.O.N.* as Defendants in this case.

All of the Defendants have filed Motions for Summary Judgment, [Filing No. 114; Filing No. 150; Filing No. 154], which the court discusses below.

### C.    State Defendants' Motion for Summary Judgment [Filing No. 114]

The State Defendants move for summary judgment on all claims against them, arguing that Mr. Gary's Eighth Amendment deliberate indifference claim against Warden Reagle fails because he had no personal involvement in a constitutional deprivation, that Mr. Gary's Eighth Amendment deliberate indifference claims against Ms. Knotts and Mr. Solomon fail because there was no substantial risk of harm and because they did not act with deliberate indifference, and that Mr. Gary's state law negligence claims fail because he did not comply with the Indiana Tort Claims Act's ("ITCA") notice requirements and because they are entitled to immunity under the ITCA in any event.  The court addresses each argument in turn.  It notes at the outset, however, that Mr. Gary's only timely response to the State Defendants' Motion for Summary Judgment is one page and merely states conclusorily that "[t]here most certainly is a genuine dispute as to material facts in this action."  [Filing No. 149 at 1.]  Based on this bare-bones response, the State Defendants did not file a reply brief.

     1.    *Mr. Gary's Eighth Amendment claims fail because of Warden Reagle's lack of personal involvement and because no reasonable jury could conclude that the State Defendants acted with deliberate indifference toward his serious medical needs.*

        a.   <u>Mr. Gary's claim against Warden Reagle fails for lack of evidence of personal involvement or deliberate indifference.</u>

The State Defendants argue that Mr. Gary's Eighth Amendment deliberate indifference claim against Warden Reagle relates to the response to Mr. Gary's July 7, 2023 Request for Interview in which Mr. Gary was advised to use his inhaler. [Filing No. 116 at 10.] They maintain that Warden Reagle's secretary forwarded the Request to other personnel for a response and Warden Reagle had no knowledge of the Request until after Mr. Gary filed this lawsuit. [Filing No. 116 at 10.] They note that the signature on the July 7, 2023 Request for Interview is not Warden Reagle's, that Mr. Gary testified at his deposition that he had no reason to dispute that the request was forwarded to medical staff to respond, and that there is no evidence that Warden Reagle "approved, facilitated, condoned, or otherwise turned a blind eye to [Mr.] Gary's conditions in G-Cellhouse during nearby construction." [Filing No. 116 at 10.]

"[I]ndividual liability under § 1983…requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quotation and citation omitted). "The plaintiff must demonstrate a causal connection between (1) the sued official and (2) the alleged misconduct." *Id.* For a public official to be individually liable for a subordinate's constitutional violation, the official must both "(1) know about the conduct and (2) facilitate,

approve, condone, or turn a blind eye toward it." *Gonzalez v. McHenry Cnty., Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (quotation and citation omitted).

Mr. Gary has not provided any evidence that Warden Reagle received Mr. Gary's July 7, 2023 Request for Interview in which he asks to be moved to another unit, or that Warden Reagle even knew about the request. Although the Request for Interview lists Warden Reagle in the "TO:" blank, the signature does not appear to be Warden Reagle's. [Filing No. 115-4.] Moreover, the State Defendants submitted evidence that Warden Reagle's secretary would receive requests sent to Warden Reagle and forward them to the appropriate personnel to respond, that Warden Reagle did not know of Mr. Gary's Request for Interview until this lawsuit was filed, and that Warden Reagle did not have any conversations with the recipient of the Request for Interview because he did not know about it. [*See* Filing No. 115-5 at 2; Filing No. 115-7 at 2.] Mr. Gary has not presented any evidence to contradict the State Defendants' submissions.

Moreover, even if the response to Mr. Gary's Request for Interview could be attributed to Warden Reagle, there is absolutely no evidence that the response demonstrated deliberate indifference. Indeed, the only evidence of record is that the response of Warden Reagle's office was to forward the request to the place where authority for a medical move must originate – which the State Defendants' evidence indisputably shows must be initiated with medical personnel.

Because there is no evidence that Warden Reagle was personally involved in the decision not to move Mr. Gary to another unit in response to his July 7, 2023

Request for Interview and no evidence of deliberate indifference in the handling of that request, the court **GRANTS** the State Defendants' Motion for Summary Judgment on that claim.  [Filing No. 114.]

      b.   <u>Mr. Gary's claims against Ms. Knotts and Mr. Solomon fail because no reasonable jury could conclude that they acted with deliberate indifference toward his serious medical needs.</u>

          i.   The court assumes for purposes of summary judgment that Mr. Gary had an objectively serious medical need and that there was a substantial risk of harm.

The State Defendants argue that Mr. Gary cannot show that his exposure to nearby construction on a few isolated days amounted to an objectively serious condition.  [Filing No. 116 at 11.]  They assert that Mr. Gary focuses on two days – June 26, 2023 and July 6, 2023 – and that "[o]n both dates the construction was not occurring directly on [his] range in G-Cellhouse."  [Filing No. 116 at 11.]  The State Defendants argue that facility inspections during the construction process showed that the unit was being well-maintained and that staff and inmates had access to dust masks and goggles.  [Filing No. 116 at 11.]  They note that Mr. Gary had access to his inhaler during the two dates he focuses on, that all nurses advised him to use his inhaler, that medical staff never found that a move away from construction was medically necessary, that there is no evidence that Mr. Gary suffered from asthma attacks during the construction, and that "any temporary discomfort [from breathing difficulty] is not serious enough to rise to a constitutional injury under the Eighth Amendment."  [Filing No. 116 at 11.]  As for

Mr. Gary's claim that his arm was burned from nearby welding debris, the State Defendants argue that he would have required emergency medical care if he had really sustained a fourth degree burn, that he did not submit any medical or health care requests for a burn, that he received prompt attention from a correctional officer and nurse when he claimed he had sustained a burn, and that there is no evidence establishing that the burn was caused by construction debris. [Filing No. 116 at 12.] They argue further that Mr. Gary's claim that he suffered from mental anguish does not rise to the level of an objectively serious risk under the Eighth Amendment because while "[h]e appears to claim he suffers from post-traumatic stress if he hears a grinder or smells metallic dust or burning that causes him to panic and gasp for air," "[t]his is not a reasonable response to a couple days of nearby construction" and is not sufficiently serious under the Eighth Amendment. [Filing No. 116 at 13.]

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "Asthma, depending upon its degree, can be a serious medical condition." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). Evidence that Mr. Gary suffers from asthma and his claim that he suffers from COPD "signal[s] a medical need that even a lay person would recognize as serious." *Greeno*, 414 F.3d at 651. While the State Defendants argue that Mr. Gary had access to his inhaler at all times, the court assumes for purposes of summary judgment that Mr. Gary's

29

asthma and claimed COPD were objectively serious medical conditions.  It also assumes for purposes of summary judgment that Mr. Gary being in G-Cellhouse created a substantial risk of serious harm because of nearby construction on June 23, 2023 and July 6, 2023.

> ii.    No reasonable jury could conclude that Mr. Solomon and Ms. Knotts acted with deliberate indifference toward Mr. Gary's serious medical needs.

The State Defendants argue that while Mr. Solomon and Ms. Knotts acknowledged Mr. Gary's verbal request in passing to move to another unit, Mr. Solomon advised that there was not an available cell to move him to and a move was never ordered as medically necessary by medical staff.  [Filing No. 116 at 14.] They note that it is undisputed that a medical move first requires a physician to determine that the move is medically necessary and that a move was never ordered for Mr. Gary.  [Filing No. 116 at 14-15.]  The State Defendants assert that "there is no evidence that [Mr.] Gary suffered from any medical complications from not being moved further from the construction on the two dates when construction occurred closer to [Mr.] Gary's range" and "[n]or is there any evidence to reasonably infer that [the] State Defendants should have recognized a move was necessary."  [Filing No. 116 at 15.]  They contend that although Mr. Gary was not seen by medical staff until August 10, 2023, in response to his Requests for Health Care, he saw nurses every day, including twice daily to take his medication, and that "his mere disagreement with reasonable medical judgment does not violate the Eighth Amendment."  [Filing No. 116 at 15.]  Finally, they argue that there is no evidence

that they intended for Mr. Gary to suffer emotional harm by not moving him to another unit or to infer that there was "an obvious substantial[ ] risk that [Mr.] Solomon or [Ms. Knotts] should have been aware of."  [Filing No. 116 at 15.]

Mr. Gary's Eighth Amendment claim against Mr. Solomon and Ms. Knotts is based on his request to be moved to another unit because the construction was causing breathing problems.  Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions."  *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  A conditions-of-confinement claim includes both an objective and subjective component.  *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019).  Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind – that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference."  *Thomas*, 2 F.4th at 720.  Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks."  *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (quotations and citations omitted).  "[N]egligence [n]or even gross negligence is not enough; the conduct must be reckless in the criminal sense."  *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

In order to prove the subjective component, it is not enough for a plaintiff to show that he was exposed to a risk or even that the defendants knew about the risk; instead, "prison officials who actually knew of a substantial risk to inmate health or

safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Put another way, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Id.*

Here, no reasonable jury could conclude that Mr. Solomon or Ms. Knotts acted unreasonably, even if they knew that leaving Mr. Gary on the unit was exacerbating his asthma or claimed COPD. The only evidence related to Mr. Solomon is that on July 5, 2023, Mr. Gary saw Mr. Solomon in his office on the way to the showers and asked about being moved away from the construction to another range, and Mr. Solomon acknowledged Mr. Gary's request and advised him that he did not have a vacant cell to move him to. [Filing No. 115-1 at 22-25.] The only evidence as to Ms. Knotts is that Mr. Gary also saw her on July 5, 2023, while he was being escorted by a non-party correctional officer from shower time, asked her about a medical move, but did not tell her about the medical reasons for his request at that time. [Filing No. 115-1 at 26-28.] Ms. Knotts acknowledged Mr. Gary's pending move request during their brief passing encounter but did not have access to his medical records. [Filing No. 115-6 at 2-3.] Further, and significantly, any medical move request by Mr. Gary would have been initially submitted to and handled by medical staff, and a medical provider needed to order a move based on medical reasons. [Filing No. 115-6 at 2-3; Filing No. 150-1 at 4.]

The court notes that none of the evidence or arguments that Mr. Gary submitted with his belated response to the State Defendants' Motion for Summary Judgment – and that the court has stricken – would change the court's finding.  Mr. Gary belatedly submitted a written statement from "Ofc. J. Jessie," in which he states that he recalled Mr. Gary asking Ms. Knotts about a medical move on July 6, 2023.  [Filing No. 181 at 21.][14]  But, as discussed above, this evidence does not show that Ms. Knotts acted with deliberate indifference to Mr. Gary's health, particularly when Mr. Gary himself acknowledges that he did not tell her that his request for a move was related to his health and when she did not have the power to order that Mr. Gary be moved.  Additionally, while Mr. Woodard states in his Affidavit that no masks were passed out during the construction in June and July 2023, [Filing No. 171 at 6-7], Mr. Gary has not presented any evidence that Mr. Solomon or Ms. Knotts were responsible for providing protective equipment to inmates.

Because no reasonable jury could conclude that Mr. Solomon or Ms. Knotts acted with deliberate indifference to Mr. Gary's asthma and claimed COPD by refusing to move him to another unit during construction on June 26, 2023 and July 6, 2023, the court **GRANTS** the State Defendants' Motion for Summary Judgment

---

[14] Mr. Gary also belatedly submitted an affidavit from fellow inmate Curtis Woodard, [Filing No. 181 at 6-7], and a statement from fellow inmate Jason Schwartz, [Filing No. 181 at 8], but neither relates specifically to Mr. Solomon's or Ms. Knotts' actions.

as to Mr. Gary's Eighth Amendment deliberate indifference claims against Mr. Solomon and Ms. Knotts.  [Filing No. 114.][15]

> 2.    *Mr. Gary's state law claims fail because Mr. Gary did not comply with the ITCA's notice requirements.*

The State Defendants argue in support of their Motion for Summary Judgment that Mr. Gary's state law negligence claims against them fail because he did not satisfy the ITCA's notice requirements and because they are entitled to immunity under the ITCA.  [Filing No. 116 at 16-19.]  As to the ITCA's notice requirements, the State Defendants argue that the ITCA requires a plaintiff to provide notice to the attorney general or the involved state agency within 270 days after the loss occurs, that the requirement also applies to claims against state employees, that the government entity then has 90 days to investigate and either approve or deny the claim, and that a plaintiff may not initiate a lawsuit unless the claim has been denied in whole or in part.  [Filing No. 116 at 16-17.]  They assert that Mr. Gary did not submit a tort claim notice to the Attorney General's Office until over 400 days after the incidents giving rise to his claims – the construction on June 26, 2023 and July 6, 2023 – and several months after he initiated this litigation and filed the operative Amended Complaint.  [Filing No. 116 at 17-18.]

---

[15] Because the court has found that Mr. Gary's Eighth Amendment deliberate indifference claims against the State Defendants fail as a matter of law for lack of personal involvement (Warden Reagle) and for lack of evidence showing that they acted with deliberate indifference (all State Defendants), it need not and will not consider whether the State Defendants are entitled to qualified immunity on those claims.

Because the court has granted summary judgment in favor of the State Defendants on Mr. Gary's federal claims against them, it first considers whether it will exercise supplemental jurisdiction over his remaining state law negligence claim against the State Defendants. That decision is within the court's discretion. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016).

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in every case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quotations and citations omitted). In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999). Exceptions to the general rule exist "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have

already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claim can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quotation and citation omitted).

Here, it is absolutely clear how Mr. Gary's negligence claim against the State Defendants should be decided, and the parties and the court have already committed substantial resources to that claim, so the court, in its discretion, exercises supplemental jurisdiction over that claim. Indiana Code § 34-13-3-6(a) provides that "a claim against the state is barred unless notice is filed with the attorney general or the state agency involved within two hundred seventy (270) days after the loss occurs." This provision also applies to suits against state employees. *Thomas v. Starks*, 159 F. App'x 716, 718 (7th Cir. 2005). "A person may not initiate a suit against a governmental entity [or employee] unless the person's claim has been denied in whole or in part." Ind. Code § 34-13-3-13.

Mr. Gary submitted his notice under the ITCA to the Attorney General's Office on August 12, 2024, [Filing No. 115-10], more than a year after the events underlying this litigation took place, more than eight months after initiating this litigation, and more than five months after filing the operative Amended Complaint. His notice under the ITCA was untimely, and he filed suit long before receiving any denial of his claims. The State Defendants raised Mr. Gary's failure to comply with the ITCA's notice requirements as an affirmative defense in their Answer. [*See* Filing No. 22 at 3.] "Once a defendant raises an issue of noncompliance [with the

36

ITCA], the burden shifts to the plaintiff to prove compliance." *Gibson v. Carrington,* 2021 WL 1667036, at *2 (S.D. Ind. Apr. 27, 2021) (citing *Brown v. Alexander,* 876 N.E.2d 376, 384 (Ind. Ct. App. 2007)).  Mr. Gary has not provided any evidence to show that he complied with the ITCA's notice requirements.[16]  Accordingly, the

---

[16] In his belated Brief in Support of Precluding Summary Judgment for State Defendant(s), Mr. Gary acknowledges that he did not comply with the ITCA's notice requirement but contends that he was not aware of the requirement and that prison procedures advise that once the internal grievance process is complete, inmates can pursue relief.  [Filing No. 180 at 9-10.]  He also argues that the State Defendants did not raise the notice issue in their "exhaustion of remedies filing" and that he noted in a September 7, 2023 grievance that he was "moving forward to the legal process."  [Filing No. 180 at 9-10.]  Mr. Gary's arguments – which, again, are belated – are meritless.  First, Mr. Gary's lack of knowledge regarding the ITCA's notice requirement is not an excuse for non-compliance.  *See, e.g., Cervantes v. Bowen,* 2021 WL 5845013, at *3 (S.D. Ind. Dec. 9, 2021).  Second, the State Defendants were not under any obligation to advise Mr. Gary of the need to comply with the ITCA's notice requirement.  *See Town of Cicero v. Sethi,* 189 N.E.3d 194, 208 (Ind. Ct. App. 2022) ("Indiana law does not impose an affirmative duty on [a defendant] to advise [a plaintiff] that they were required to [comply with ITCA's notice requirement].").  Mr. Gary appears to argue that the State Defendants induced him into believing that compliance was not necessary by providing instructions for the grievance process which stated "[h]aving exhausted administrative remedy, you may then elect to proceed in state or federal court.". [Filing No. 180 at 9-10; Filing No. 181 at 11.]  But this statement does not provide any information regarding whether other prerequisites for bringing a claim in state or federal court must also be met.  Third, the State Defendants were not required to raise the notice issue in any "exhaustion filings."  Rather, once they raised the issue in their Answer, the burden shifted to Mr. Gary to prove compliance.  *Gibson,* 2021 WL 1667036, at *2.  Finally, noting that he was "moving forward to the legal process" in a grievance did not satisfy the ITCA's notice requirement.  *See Schoettmer v. Wright,* 992 N.E.2d 702, 707 (Ind. 2013) ("[M]ere actual knowledge of an occurrence, even when coupled with routine investigation, does not constitute substantial compliance [with the ITCA's notice requirement].") (quotation and citation omitted).

court **GRANTS** the State Defendants' Motion for Summary Judgment on Mr. Gary's state law negligence claims against them.  [Filing No. 114.][17]

In sum, the court **GRANTS** the State Defendants' Motion for Summary on all of Mr. Gary's claims against the State Defendants.  [Filing No. 114.]

### D.    Centurion Defendants' Motion for Summary Judgment [Filing No. 150]

The Centurion Defendants move for summary judgment on all of Mr. Gary's claims against them, arguing that Mr. Gary did not have an objectively serious medical need, that Nurse Cottrell did not act with deliberate indifference in any event, and that she did not breach the standard of care in connection with Mr. Gary's state law negligence claim.  [Filing No. 151 at 16-22.]  They also contend that because Mr. Gary has not satisfied the requirements of the Indiana Medical Malpractice Act, his negligence claim against Centurion fails.  [Filing No. 151 at 22-23.]  The court turns first to Mr. Gary's federal claim against Nurse Cottrell before addressing his state law negligence claim against the Centurion Defendants.

   *1.    Mr. Gary's Eighth Amendment claim against Nurse Cottrell fails because no reasonable jury could conclude that she acted with deliberate indifference toward Mr. Gary's serious medical needs.*

   a.    <u>The court assumes for purposes of summary judgment that Mr. Gary had an objectively serious medical need.</u>

---

[17] Because the court grants the State Defendants' Motion for Summary Judgment on Mr. Gary's state law negligence claims for failure to comply with the ITCA's notice requirements, it need not and will not consider whether the State Defendants are entitled to immunity on those claims under the ITCA.

The Centurion Defendants acknowledge that Mr. Gary's asthma and claimed COPD may have been a serious medical condition, but argue that "what he wanted when he spoke to Nurse Cottrell on June 26, 2023 was to be moved out of the segregation unit to a different unit due to the construction and its impact on his underlying medical conditions"; that he had access to dust masks, goggles, and his inhaler at all times; and that he "was not even on the same floor as the construction because he had been moved to a different floor." [Filing No. 151 at 18-19.] They assert that Mr. Gary's request to be moved "was not an objectively serious medical need that required Nurse Cottrell to stop seeing her other patients and address Mr. Gary's request immediately." [Filing No. 151 at 19.]

As it did in connection with the State Defendants' Motion for Summary Judgment, the court assumes for purposes of summary judgment that Mr. Gary's asthma and claimed COPD constituted serious medical needs. It goes on to consider whether Nurse Cottrell acted with deliberate indifference.

        b.   <u>No reasonable jury could conclude that Nurse Cottrell acted with deliberate indifference toward Mr. Gary's serious medical needs.</u>

The Centurion Defendants argue that at most, Mr. Gary handed Nurse Cottrell two Requests for Health Care forms while she was "tending to other patients either passing medication or conducting Nursing Sick Call," and that she submitted the forms to the nurses' station. [Filing No. 151 at 19.] The Centurion Defendants contend that "[i]t was then up to another nurse to actually review and triage the Request[s] and determine what action to take." [Filing No. 151 at 19.]

They argue that Mr. Gary was scheduled for Nursing Sick Call on August 10, 2023, and that Nurse Cottrell conducted Nursing Sick Call that day and by then, all of his medical issues he had discussed in his Requests for Health Care had already been addressed or resolved.  [Filing No. 151 at 19.]  The Centurion Defendants assert that Mr. Gary is blaming Nurse Cottrell for the fact that he was not seen until August 10, 2023, related to his June 27, July 6, and August 7, 2023 Requests for Health Care, but that she "is not the one who reviewed and determined what action to take in response to [his] Requests," and that she properly turned his Requests in to the nurses' station and "was not the one who triaged the Requests and determined that they did not need to be addressed right away."  [Filing No. 151 at 20.]  The Centurion Defendants further argue that when Mr. Gary complained to Nurse Cottrell while she was passing medication or conducting Nursing Sick Call, she could not stop her work to attend to Mr. Gary when he did not "present with an acute or emergency medical issue," and his request to be moved to another unit was not an emergency medical need.  [Filing No. 151 at 20.]

In his response, Mr. Gary argues that Nurse Cottrell knew that he needed "clean fresh air" and failed to take action, instead "passing the Health Care Request on to another nurse."  [Filing No. 176 at 4.]  He asserts that "the reasonably prudent juror or layman would remove the patient from the smoke and dust filled environment."  [Filing No. 176 at 2.]  He submits Requests for Health Care forms and notes from his August 10, 2023 nurse visit – all of which were already part of the record – along with the written statement from Mr. Schwartz that he belatedly

submitted in connection with the State Defendants' Motion for Summary Judgment in which Mr. Schwartz states:

> In June and July I lived in cell 6 on range 4D next to Gary. I get my meds same time as Gary. I was at my door when Gary talked to the nurses about how he can't breathe cause of all the dust and smoke. I seen the nurses get the health care forms. In July I got up and saw Gary was wavin[g] a napkin out his bars. He said he was wavin[g] a white flag. A guy was weldin[g] an[d] the sparks were goin[g] in his cell. I could see…all over the range. Gary told me some come in his cell and burn[e]d him. I felt bad for Gary cause he's a good old skool G.

[Filing No. 177-1 at 4.]

The Centurion Defendants argue in their reply that Mr. Gary states in his response that his serious medical issue was "the need for clean air" due to the construction, but that he "does not claim that he could not breathe or was having any specific medical issue when he encountered Nurse Cottrell other than wanting to be moved to a different area." [Filing No. 178 at 1.] They note that Mr. Schwartz "does not state anything specific with regard to Nurse…Cottrell on the two specific days that are at issue in this case" and that Mr. Gary does not refute any of the evidence submitted by the Centurion Defendants. [Filing No. 178 at 1-2.] The Centurion Defendants reiterate that Nurse Cottrell turned Mr. Gary's Request for Health Care forms in to the appropriate nursing staff and told Mr. Gary to use his inhaler, and that Mr. Gary has not disputed that on June 26, 2023 – the day that he claims he saw Nurse Cottrell – Mr. Gary was not on the same floor as the construction and that he had access to a dust mask, goggles, and an inhaler. [Filing No. 178 at 2.] They argue that his request to be moved "was not urgent such that it

would have been reasonable for Nurse Cottrell to stop her medication pass, talk to prison administration, and try to get Mr. Gary moved." [Filing No. 178 at 2.]

The evidence reflects that Nurse Cottrell does not specifically remember encountering Mr. Gary, that she could have encountered him while passing out medication in G-Cellhouse or on Nursing Sick Call, that Mr. Gary claims that he gave her a Request for Health Care form on June 26, 2023, and that if she had received a Request for Health Care form from Mr. Gary she would have passed it on to the nurses' station for triage but would not have stopped what she was doing unless it was a medical emergency. [Filing No. 150-1 at 5-6.] Mr. Gary has not presented any evidence that he informed Nurse Cottrell that he was suffering from a medical emergency. Instead, he submitted a Request for Health Care form on June 27, 2023, in which he requested a medical move but did not request treatment for his breathing issues. [Filing No. 150-2 at 8.] Nurse Cottrell's only other involvement was that she saw Mr. Gary on August 10, 2023, during Nursing Sick Call, in response to his Requests for Health Care. And Mr. Schwartz's statement does not specifically mention Nurse Cottrell. The court does not put much stock in the Centurion Defendants' argument that Mr. Gary did not report any ongoing issues at that time – delaying treatment also meant that the construction had ended by that point – but the fact remains that Nurse Cottrell was not responsible for triaging Mr. Gary's Requests for Health Care and determining when he should be seen for his breathing issues. Though not directly relevant to the claims against

Nurse Cottrell, the undisputed chronology presented in this case shows a general pattern of prompt attention to Mr. Gary's numerous health care requests.

Even if the court were to consider Mr. Woodard's Affidavit, which Mr. Gary submitted with his improper surreply, it would not change the result. Mr. Woodard states:

> I was in seg. with Gary in June and July in cell 2. After they cleared out strip cell on 2 range we got moved down to 4d an[d] they just come right in an[d] started out with torches an[d] grinders an[d] jackhammers. [Weren't] no fans or nothin[g] [brought] in an[d] no masks passed out. Got really loud [and] dusty as hell to[o]! [H]ad to clean my cell up [every] day sometimes too!

[Filing No. 182-1.] Mr. Woodard does not discuss Nurse Cottrell at all, or her interactions with Mr. Gary.

In short, Mr. Gary has not presented evidence from which a reasonable jury could conclude that Nurse Cottrell acted with deliberate indifference toward Mr. Gary's serious medical needs. The court **GRANTS** the Centurion Defendants' Motion for Summary Judgment on Mr. Gary's Eighth Amendment deliberate indifference claim against Nurse Cottrell. [Filing No. 150.][18]

> 2.    *Mr. Gary's state law medical negligence claim against Nurse Cottrell fails because Mr. Gary has not designated expert evidence to support that claim.*

The Centurion Defendants argue that expert testimony is required regarding whether Nurse Cottrell met the standard of care during her interactions with Mr.

---

[18] Mr. Gary mentions a *Monell* claim in his response to the Centurion Defendants' Motion for Summary Judgment, but the court previously dismissed his *Monell* claim against Centurion when it granted a Motion for Partial Judgment on the Pleadings filed by Centurion and others. [Filing No. 134.]

Gary and that because Mr. Gary has not presented any expert evidence, his medical negligence claim against Nurse Cottrell fails.  [Filing No. 151 at 20-22.]

Mr. Gary does not specifically address the Centurion Defendants' argument that he needs to present expert evidence to show that Nurse Cottrell did not meet the standard of care.  [*See* Filing No. 176.]

The Centurion Defendants reiterate their arguments in their reply.  [Filing No. 178.]

As with its consideration of whether it should exercise supplemental jurisdiction over Mr. Gary's state law claims against the State Defendants, the court finds that because it is absolutely clear how Mr. Gary's state law claims against the Centurion Defendants should be decided, and since the court and the parties have already committed substantial resources to that claim, the exercise of supplemental jurisdiction is appropriate.  *Davis*, 534 F.3d at 654 (quotation and citation omitted).  With the exception of cases where the alleged negligence is of a type that would be readily apparent to a layperson, expert testimony is required to establish a deviation from the standard of care in medical negligence cases. *Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992); *see also Clarian Health Partners v. Wagler*, 925 N.E.2d 388, 392 (Ind. Ct. App. 2010) ("In a medical negligence claim, the plaintiff must prove by expert testimony not only that the defendant was negligent, but also that the defendant's negligence proximately caused the plaintiff's injury.")  Here, it is undisputed that Nurse Cottrell passed Mr. Gary's Request for Health Care form to the nurses' station for handling, that she

told him to use his inhaler, and that she saw him during Nurses' Sick Call on August 10, 2023. It is not clear that a lay person could determine Nurse Cottrell breached the standard of care by passing his Request for Health Care form on to the nurses' station, rather than stopping her duties to assist him immediately. Mr. Gary has not designated any expert evidence to support that conclusion, which is fatal to his medical negligence claim against Nurse Cottrell. *Culbertson*, 602 N.E.2d at 104. Accordingly, the court **GRANTS** the Centurion Defendants' Motion for Summary Judgment on Mr. Gary's state law medical negligence claim against Nurse Cottrell. [Filing No. 150.]

> 3.     *Mr. Gary's state law medical negligence claim against Centurion fails because there is no evidence that Mr. Gary submitted his claim to a medical review panel before initiating litigation.*

The Centurion Defendants argue that the court does not have subject matter jurisdiction over Mr. Gary's state law claim against Centurion because he did not present his complaint against Centurion to a medical review panel and obtain the panel's opinion before initiating this lawsuit, as required by the Indiana Medical Malpractice Act. [Filing No. 151 at 22-23.] They also assert that Mr. Gary did not comply with the Indiana Medical Malpractice Act because he has not filed his claim with the Indiana Department of Insurance. [Filing No. 151 at 23.]

Mr. Gary did not address this argument in his response, [*see* Filing No. 175], which the Centurion Defendants point out in their reply, [Filing No. 178 at 2].

The Indiana Medical Malpractice Act requires a plaintiff to present his malpractice complaint to a medical review panel and obtain an opinion from the

panel before initiating a lawsuit. Ind. Code § 34-18-8-4. Mr. Gary does not dispute that he did not present his medical negligence claim against Centurion to a medical review panel. Contrary to the Centurion Defendants' argument, however, a failure to comply with that requirement of the Indiana Medical Malpractice Act is treated as a failure to exhaust administrative remedies, which "'is a procedural error and does not implicate the trial court's subject matter jurisdiction.'" *Dunigan v. Centurion Health of Indiana, LLC*, 231 N.E.3d 218, at *4 n.4 (Ind. Ct. App. 2024) (quoting *First Am. Title Ins. Co. v. Robertson*, 19 N.E.3d 757, 760 (Ind. 2014)). The court finds that Mr. Gary has failed to satisfy the Indiana Medical Malpractice Act's requirement that he present his medical negligence claim against Centurion to a medical review panel before initiating this litigation, that this failure does not deprive the court of subject matter jurisdiction over his claim, but that Centurion is entitled to summary judgment on that claim. The Centurion Defendants' Motion for Summary Judgment is **GRANTED** on Mr. Gary's state law medical negligence claim against Centurion. [Filing No. 150.]

In sum, the court **GRANTS** the Centurion Defendants' Motion for Summary Judgment as to all of Mr. Gary's claims against them. [Filing No. 150.]

### E.    Nurse Daso's Motion for Summary Judgment [Filing No. 154]

Nurse Daso moves for summary judgment, arguing that he was not employed at PCF during the events underlying the litigation. [Filing No. 155.] The court addresses each of Mr. Gary's claims in turn.

    1.    *Mr. Gary's Eighth Amendment claim against Nurse Daso fails because no reasonable jury could conclude that Nurse Daso was involved in any constitutional deprivations.*

In support of his Motion for Summary Judgment, Nurse Daso argues that he was not personally involved in any alleged constitutional deprivations and that Mr. Gary has not presented any evidence that he caused Mr. Gary's injuries, so Mr. Gary's Eighth Amendment claim against him fails.  [Filing No. 155 at 4-6.]

Mr. Gary did not respond to Nurse Daso's Motion for Summary Judgment.

Because Mr. Gary did not file a response to Nurse Daso's Motion for Summary Judgment, the court could grant the Motion on that basis alone.  S.D. Ind. L.R. 7-1(c)(5) ("The court may summarily rule on a motion if an opposing party does not file a response within the deadline").  Because the court prefers to rule on the merits of motions, however, it will consider Nurse Daso's arguments below.

As discussed above in connection with Mr. Gary's claims against Warden Reagle, "individual liability under § 1983…requires personal involvement in the alleged constitutional deprivation." *Colbert*, 851 F.3d at 657.  Nurse Daso has submitted evidence that he is a male Registered Nurse who began working at PCF in November 2020, his last day of employment at PCF was April 26, 2023, and he was not employed at PCF during June or July 2023.  [Filing No. 154-2 at 1-2.]  Mr. Gary has not disputed this evidence.  Further, Mr. Gary has maintained that the nurse who failed to treat his burns adequately is a female, [*see, e.g.*, Filing No. 154-4 at 2], but Nurse Daso is a male, [Filing No. 154-2 at 2].  No reasonable jury could conclude that Nurse Daso was involved in any constitutional deprivations that Mr.

Gary alleges he suffered in June and July 2023 – a time when Nurse Daso was not working at PCF.  Accordingly, Nurse Daso's Motion for Summary Judgment is **GRANTED** as to Mr. Gary's Eighth Amendment deliberate indifference claim against him.  [Filing No. 154.]

> 2.    *Mr. Gary's state law claim against Nurse Daso fails because no reasonable jury could conclude that he proximately caused any injury to Mr. Gary.*

Mr. Gary also asserts a state law negligence claim against Nurse Daso.  [*See* Filing No. 11 at 4; Filing No. 45 at 3.]  Consistent with its exercise of supplemental jurisdiction over Mr. Gary's state law claims against the State Defendants and the Centurion Defendants, the court finds that it is absolutely clear how Mr. Gary's state law claim against Nurse Daso should be decided and that the court and the parties have already committed substantial resources to that claim.  Accordingly, the court, in its discretion, exercises supplemental jurisdiction over that claim. *Davis*, 534 F.3d at 654 (quotation and citation omitted).

Although Nurse Daso does not explicitly address Mr. Gary's state law medical negligence claim against him in his Motion for Summary Judgment, [*see* Filing No. 155], Nurse Daso's argument that Mr. Gary's Eighth Amendment deliberate indifference claim fails because Mr. Gary has not presented any evidence showing that his injuries were proximately caused by Nurse Daso applies with equal force to Mr. Gary's medical negligence claim against Nurse Daso because he also must show proximate cause in connection with that claim. *Abbas v. Neter-Nu, 261 N.E.3d 233, 242 (Ind. 2025).*  Specifically, because Mr. Gary has not disputed

that Nurse Daso was not working at PCF during June and July 2023 – when Mr. Gary claims that he received inadequate medical care – Nurse Daso could not have proximately caused any injuries during those dates and summary judgment on Mr. Gary's state law medical negligence claim against Nurse Daso is appropriate as well.

The court **GRANTS** Nurse Daso's Motion for Summary Judgment on all of Mr. Gary's claims against him.  [Filing No. 154.][19]

## III.
## Conclusion

For the foregoing reasons, the court:

- **GRANTS** the Centurion Defendants' Motion to Strike Plaintiff's Improper Surreply, [183], and **STRIKES** Mr. Gary's Surreply, [Filing No. 182];

- **GRANTS** the State Defendants' Motion to Strike Summary Judgment Response and Designation, [184], and **STRIKES** Mr. Gary's Motion of Opposition to State Defendant(s) Motion for

---

[19] The court again notes that on September 18, 2024, it ordered the Clerk to correct the name "Nurse Cemi" – an individual Mr. Gary originally named as a Defendant – to "Oluwafemi Daso, R.N."  [Filing No. 45 at 3.]  As discussed above, this was based on Centurion's Notice to the Court Regarding Defendant Nurse Cemi, in which Centurion represented that it did not have an employee with the last name "Cemi," that "it is believed that 'Nurse Cemi' is actually Oluwafemi Daso, R.N.," and that Nurse Daso was not a Centurion employee but was an agency nurse provided through Westways Staffing Services.  [Filing No. 26 at 1.]  Mr. Gary acknowledged the court's substitution of Nurse Daso for Nurse Cemi, [Filing No. 35], and he has not argued, nor is there any evidence indicating, that Centurion misled him regarding Nurse Daso's identity.  In his Motion for Summary Judgment, Nurse Daso advances arguments on behalf of Nurse Cemi in the event that "Mr. Gary continues to maintain that a female Nurse Cemi rendered medical treatment to him on July 6, 2023."  [Filing No. 155 at 7-14.]  Because Nurse Cemi is no longer a party to this litigation, and since Nurse Daso does not have standing to raise arguments on Nurse Cemi's behalf, the court will not consider any arguments regarding Nurse Cemi.

Summary Judgment, [Filing No. 179], his Brief in Support of Precluding Summary Judgment for State Defendants, [Filing No. 180], and his Designation of Evidence and Proposed Witness List, [Filing No. 181];

- **GRANTS** the State Defendants' Motion for Summary Judgment, [114];

- **GRANTS** the Centurion Defendants' Motion for Summary Judgment, [150]; and

- **GRANTS** Nurse Daso's Motion for Summary Judgment, [154].

Final judgment shall enter accordingly.  The court also **DIRECTS** the **CLERK** to

**CORRECT** the spelling of Defendant "Thomas Soloman" to "Thomas Solomon" on

the docket and to **TERMINATE** Lisa Hamblen and Johnna Fritch, D.O.N. as

Defendants in this case.

Date:  <u>January 13, 2026</u>

<u>Debra McVicker Lynch</u>
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

**<u>Distribution via ECF to all counsel of record</u>**

**<u>Distribution via United States Mail to:</u>**

Loren D. Gary
#251375
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Rd.
Pendleton, IN 46064